IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
February 03, 2015 Session

**STATE OF TENNESSEE v. JAMES ROBERT CHRISTENSEN, JR.**

**Appeal from the Circuit Court for Tipton County**
**No. 7799     Joe H. Walker, III, Judge**

_____

**No. W2014-00931-CCA-R3-CD  -  Filed May 14, 2015**

_____

JOHN EVERETT WILLIAMS, J., concurring in part and dissenting in part.

I agree that in this case, there are three separate state actions to consider when determining whether the evidence seized, as a result of the warrantless search of the defendant's residence, should have been suppressed. First, the investigators entered the defendant's property to conduct a "follow-up investigation," without a search warrant, despite the defendant's "no trespassing" signs. Second, after smelling methamphetamine, Investigator Chunn forcibly entered the defendant's residence and conducted a brief sweep, during which he saw the firearms and some of the components for making methamphetamine, but did not see the active nor inactive labs. Third, after the defendant told officers that the lab was in the freezer, the investigators re-entered the defendant's residence and collected the active lab from the refrigerator and the inactive lab from the deep freezer. I believe the majority has correctly analyzed actions two and three. My disagreement with the majority only relates to the State's first action. My review of the record leads me to conclude that this defendant had clearly revoked any implied consent for the officers to come upon his property without a search warrant. Without lawfully being upon the premises, the second and third actions are void and the fruit of the poisonous tree.

I begin my analysis at the same point as the majority.  A search without a warrant is presumptively unreasonable, and any evidence obtained pursuant to such a search is subject to suppression unless the State demonstrates that the search was conducted under

one of the narrowly defined exceptions to the warrant requirement. *State v. Talley*, 307 S.W.3d 723, 729-30 (Tenn. 2010). I also agree with the majority that the totality of the circumstances in this case should be examined to determine whether the defendant revoked the implied consent invitation to his front door. This case does not involve a search incident to a lawful arrest, the plain view doctrine, stop and frisk, hot pursuit, or a search under exigent circumstances.[1] The language used in this case would suggest that this search is incident to a "follow-up investigation." Being unaware of any such named exception to the requirement for a search warrant, I believe the majority correct when they review this action as being akin to a "knock and talk" situation.

This record is devoid of any attempt to obtain, or mention of obtaining, a search warrant to access and discover any illegal activity regarding methamphetamine manufacturing upon the property of the defendant. It is difficult to determine the reasonableness of officers' actions when they do not attempt to convey why they chose not to get a search warrant but instead relied upon an exception to the requirement for a search warrant. Upon this record, we do not know if it saved them 30 minutes, an hour, two hours or longer. Given that the burden is on the State to prove the reasonableness of the warrantless search, I would have expected some testimony to explain why the officers wished to abandon a tried and true and safe practice of acquiring a search warrant to enter the residence in favor of risking the entire suppression of any evidence. I fear that the investigators are operating under an erroneous assumption that they have a right to enter any person's property simply to speak with them. Their assumption is valid in perhaps 98% of the cases that they investigate, as it is not is not "'illegal per se, or a condemned invasion of a person's right to privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof[.]" *State v. Cothran*, 115 S.W.3d 513, 521 (Tenn. Crim. App. 2003) (quoting *United States v. Cormier*, 220 F.3d 1103, 1109 (9th Cir. 2000)). However, this procedure is only permissible "'[*a*]*bsent express orders from*

---

[1] I wish to make it clear that I do not believe that exigent circumstances existed to allow the initial entry onto the defendant's property. Good information about an active methamphetamine lab under these circumstances is simply not enough to invoke the exception to the search warrant requirement known as exigent circumstances. These investigators knew that no one else was in the house, except the defendant. They could easily monitor who came in and out. They gave no explanation as to why they did not call for backup or other assistance. The State argued during the suppression hearing that with the information the officers had obtained, they had a duty to act. The State contended that the officers would be sued if they did not act and something happened to the defendant. I do not agree with the assertion that had the defendant been injured while the investigators were doing their duty by securing a search warrant to enter upon his premises that Tipton County was subject to civil liability.

2

*the person in possession against any possible trespass*[.]'" *Id.* (emphasis added). Thus, when someone, such as this defendant, revokes any implied consent to enter their property, officers are obliged to get a search warrant. Today, with training and technology, officers can obtain search warrants in a more timely fashion than in the past. I submit that had the officers been impeded by a locked gate, a search warrant is exactly what they would have obtained. I submit that had the investigators met this defendant coming out of his one lane driveway as they were coming in and he demanded that they leave his property, they would not have gone further upon his property without a search warrant.

I would like to address this issue by attempting to answer the question, what must a private citizen do in order to revoke the so-called implied consent invitation to the front door. The federal government can put up a single "No Trespassing" sign on a fence at a nuclear facility or an abandoned munitions facility, and a trespass there upon is a trespass. The state government can put one "No Trespassing" sign upon a state facility, and a trespass is a trespass. When entering a penal institution a sign may inform a citizen that they are giving up their Fourth Amendment right against unreasonable searches and seizures by merely entering the premises. Often, a citizen is informed that he or she is subject to greater punishment for bringing contraband into a penal institution than a school room or a church. If governments can use a single sign so effectively against citizens, why then can not citizens use a sign equally against governments? Whether the words are used by the government or a citizen, "No Trespassing" means no trespassing. The government or the private citizen may prohibit the other from entering upon the other's property without permission.

The record in this case reveals that the defendant lives in a mobile home. There are clearly nine signs upon the property.[2] Two signs appear to be at the edge of the defendant's property. They appear to have been purchased, and they have white lettering with a black background. They read "**PRIVATE PROPERTY**" in large letters and "**NO TRESPASSING**" in smaller letters. These two signs are close to the roadway and are easily visible to passersby. There is a third sign approximately two car lengths off of the main road, and this is the sign that was visible on the investigators' dash camera. It is located approximately in the middle of the property. It is very close to the driver's side of a vehicle that would be traveling along the driveway leading to the defendant's home. Atop the sign are the numbers "**342**," in white letters and a black background, arranged vertically and appearing as 911 numbers. Below the numbers is a sign with red letters on a white background, which reads "**NO TRESPASSING, HUNTING OR FISHING, VIOLATORS PROSECUTED, UNDER PENALTY OF LAW**," along with what

---

[2] I acknowledge that the descriptions of these signs are based off of a photograph of the defendant's property that was taken several months after his arrest. It was made an exhibit and the proof showed the signs were present on the day of the search.

3

appears to be a telephone number. Below that sign is another sign with blue letters on a white background that appears to be homemade. It reads "**ORGANIC FARM, DO NOT SPRAY, NO ROCIAR, ZOMA ORGANICA**." Below that sign is another like the one above, which reads "**WATER LINES, SEPTIC LINES, SMALL TREES, PLANT SEEDLINGS**" and is in the middle of two arrows pointing down the word "**SO**." Below that sign is a purchased sign with white letters and a black background reading "**KEEP OFF THE GRASS**." There is another sign appearing somewhat in the middle of the property and closest to the road, which has red letters and a white background at the top and bottom with white letters in red background in the middle. It appears to be a purchased sign and reads like the first sign above with blue letters on a white background. There is yet one more sign located on a tree with red letters and a white background that cannot be read on this record.

As the majority has noted, there are cases that can be cited that stand for the proposition that a "no trespassing" sign demonstrates a legitimate expectation of privacy that requires a warrant to legally enter the property, and there are cases that state that one sign is insufficient to create a legitimate expectation of privacy. As to the cases cited by the majority that do not believe a single trespassing sign demonstrates a legitimate expectation of privacy, I find them unpersuasive. A wall; a gate, perhaps locked; a guard tower, perhaps a manned guard tower; the installation of cameras or other surveillance devices; or more ominous warnings on the signs would more unmistakably convey that the person behind those walls revoked any implied consent for others to come upon their property. However, the problem with requiring such additional barriers to revoke the implied right of consent is that it extends a privilege to the wealthy while trampling the rights of the poor, who deserve equal protection from the intrusion of government. An individual should not be stripped of their right to exclude others from their property simply because they cannot afford to install a gate or other security items. A simple sign, whether purchased or homemade, is a clear expression of one's intention to exclude others. The sign operates to speak to all those who see it as if the owner himself were there speaking. For years, citizens, living in the city or the country, that have wanted to avoid contact with others and wanted others not to intrude upon their property have done so by posting the simple and easy to understand "No Trespassing" sign. Giving these signs great weight is consistent with living in a free society.

Here, the investigators had enough information to obtain a search warrant for the defendant's premises. For reasons unclear to me, the officers chose to enter the defendant's property without such a warrant, instead relying on an exception to the warrant requirement. The lesson here is simple: the easiest way is not always the best way. Because there is not an applicable exception to the warrant requirement to justify the entry onto the defendant's property, the search was unreasonable. Therefore, all of the evidence resulting from the search should be suppressed.

In all other regards, I agree with the majority opinion. I would remand this case to the trial court to sentence the defendant for the class B misdemeanor of resisting arrest. Because I concluded that the evidence obtained was a result of an unlawful search, I would reverse and dismiss all other convictions.

_____
JOHN EVERETT WILLIAMS, JUDGE